IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

CHRISTOPHER OLEN BAKER, )
 )
          Plaintiff, )
 )
vs. ) CIV-17-368-JHP-SPS
 )
JAMES YATES, et al., )
 )
          Defendants. )

FILED
JUN 14 2018
PATRICK KEANEY
Clerk, U.S. District Court
By_____
Deputy Clerk

## Objection To Defendant's Special Report Submission

Comes now Plaintiff, Christopher Olen Baker, with submission of an Objection to the Defendant's Special Report submission presented this Court in the above referenced cause by the Defendants.

1.) The Defendants have not acted in good faith with full disclosure of information evident in Plaintiff's medical files. Information of record, directly related to his seizure activity, that will assist this Honorable Court in fully and fairly determining the factual, as well as legal basis of Plaintiff's claim.

2.) Plaintiff's complaint clearly states his problems with the Health Service Department of the Davis Correctional Facility (DCF) began upon his arrival at the facility, and has continued for years at varied levels of intensity, neglect, and abuse.

Plaintiff believes the conclusions reached by the Supreme Court in **Ledbetter v. Goodyear Tire and Rubber Co., Inc.**, 127 S.Ct. 2162 (2007) may be applicable to his cause as well.

"[D]ifferent in kind from discrete acts, "we made clear, are "claims...based on cumulative effect of individual acts."

The case above was based on workplace sexual abuses protected by the U.S. Const. The Court allowing that showing of an ongoing pattern was acceptable for the claim asserted, and supportive of the claim made. As is the facts in Plaintiff's claim. The overall picture must be seen to properly assess and

1.

evaluate the cause Plaintiff has brought before this Court in his claim. Much of which is reflected in the various medical reports, and changes in his medication regimen, contrary to, and without proper authorization from a qualified doctor after said doctor gave proper review and weight to the findings of Specialist (Neurological Doctor) involved in diagnosis, testing, and specific determination of what medications would best treat and curtail the varied effects Plaintiff's seizures have on his life, without placing his life or his present and future health in any more jeopardy than could be controlled.

3.) The completed pre-arrival history of Plaintiff was provided to DCF, and remains a part of his medical history maintained by the facility medical department. It is intrinsic to the complaint filed, by establishing fact the health department has had a long history of changing superior medical personel orders for what can only be assessed as manipulation to cut cost while placing Plaintiff's life, health, and prosepects of longevity as a result of inferior and inadequate treatment, in jeopardy or a state of uncalled for degeneration.

4.) This is an issue for trial. Wherein all this information may be put before a jury in context and in its entirety, where the ongoing, even escalating abuse, and practices of deliberate indifference has exposed Plaintiff to numerous life threatening situations, with increased deterioration in his physical health, with more severe neurological damage than he would have had under proper care and concern for his health, with each and every seizure endured as a result, and due to the facility medical staffs alteration, and experimentation with his medications. Sowewimo v. Hennrich, 81 Fed. Appx. 893, 894 (C.A.7(Ill.)2003).

> "[A] prison official's actions or inaction is deliberately indifferent when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, "and he also draws the inference of a substantial risk. Id. at 837; Haley, 86 F.3d @ 641. An official's knowledge of a substantial risk of serious harm may also be inferred from the obviousness of the risk.

5.) For whatever reason the Defendants may employ, or argue in attempt to justify their wanton abuse of power and authority over inmates under their control, what was practiced on Plaintiff is beyond reasonable, or a realistic justification on an animal let alone a human being under the care and control of an authority without conscious, or professional restraint, as is indicated by refusal to acknowledge clear indicators (documented by the Specialists who diagnosed and established treatments, noting his tested reactions to specific medications that created life threatening allergic reactions to certain and specific medication types), all of which is accessible in his medical files with documented reports on dangers to his physical health, life, mental health, and longevity that any qualified medical professional would have observed and noted if proper concern had been afforded to the situation. Regardless of what an administrator directed. See **Self v. Crum**, 439 F.3d 1227, 1231 (10thCir.2006) (Prison officials violate the Eighth Amendment ban on cruel and unusual punishment if their deliberate indifference to **serious medical needs of prisoners consitutes the unnecassary and wanton infliction of pain.**) Emphasis added. See also, **Honeycutt v. Mitchell**, LEXIS 43177, CIV-08-140-W (2009).

6.) The Plaintiff was removed from his Specialist prescribed medications and subjected to treatment by DCF medical provider, a certified Mid-Wife (Ms. Heath). Though he had been on his prescribed medication while in the state penal system, immediately upon his arrival at DCF he was removed from his medication, placing his life in danger at a variety of levels. Ms. Heath recommended Plaintiff be seen by a Neurologist, which was refused by Ms. Kathy Miller the Health Service Administrator (HSA) of the facility at the time.

In fact, Plaintiff had been scheduled · for a follow up examination by the Neurologist at the O.U. Medical Center, who had already tested him, and established his medication regimen to control, or treat his seisures in January of 2005 while at OSR. However, the appt. was missed due to his being assaulted

3.

and hospitalized in a local hospital in Mangum, Ok. The appointment for the follow up with the Neurologist was rescheduled for July of 2005.

Just before this appointment was to take place Plaintiff was delivered to DCF, and the Health Service Administrator (HSA) refused to send Plaintiff. She, Kathy Miller, informed Plaintiff through Ms. Heath, she was not going to pay the cost of an MRI the Specialist required before the appointment, or for the cost of his being seen by the Neurologist. This was not a part of her budget.

When Plaintiff was not taken to his scheduled appointment, the Neurologist immediately rescheduled another for 90 days later. He did this on four (4) seperate occasions, according to Ms. Heath, before Ms. Miller informed him she would not pay the cost of Plaintiff being taken to see him.

This should be reflected, or indicated in Plaintiff's medical files maintained by the facility, as well as the medical files of Plaintiff at the OU Medical Center. A file Plaintiff can likely have produced on discovery, or at trial.

7.) It is obvious the Defendants have not acted in good faith to comply with this Court's Order. A review of the subject matter of the complaint (1)(a) "to ascertain the facts and circumstances" does clearly state the problem began upon arrival at DCF. The Defendants have fallen far short of providing the Court with materials relevant to the plain reading of the complaint.

Plaintiff equates this to an attempt to hide the facts, and deny this Court the facts of the matter clearly stated.

8.) The Defendants claim in their answer @ D. Cause of Action 2., pg. 3, they "do not have sufficiant information" to admit or deny actions before his arrival. However, they were provided Plaintiff's complete medical file from Oklahoma Department Of Corrections (ODOC). A file that should contain all the reports from his OU Medical Center Specialist, and the medications Plaintiff was on to control his neurological seizures.

9.) Contrary to the Defendants claim none of Plaintiff's allegations were previously adjudicated by this Court. The matter in CIV-13-140-JHP-SPS was for a specific instance dealing with a short period of time, October 4, 2012 - March 14, 2013, when Plaintiff's medications were changed several times, subjecting him to an increase in seizure activity as well as severity of seizures; undue experimentation of his medication; neglect; and medical indifference during that period. The case being dismissed for failure to exhaust.

This was a period that is an example of the prior and continued abuses endured by Plaintiff at the hands of the medical staff of DCF. This is also a period of time, and events leading up to the point where this Plaintiff was subjected to a situation that needlessly endangered his life, health (neural and physical), and longgevity. His very safety. There is no mention of that meaningful event in this report either. Though there was a record made.

10.) It was during the CIV-13-140 case that Plaintiff suffered a heart attack during a seizure and had electric shock paddles applied to save his life, off the emergency response cart, by the duty nurse. Plaintiff was taken, by wheelchair, after he was revived, to medical to await transport to the local hospital to be checked out. While waiting he overheard, along with medical personel, Ray Larimer ask the nurse why she had an ambulance called. The nurse explained that Plaintiff was none responsive and had no heatbeat, no breath, and was dead when she arrived. And, when she got him back (a heartbeat) she wanted an ambulance ready to take him to the hospital. LArimer wanted to know what she was doing bringing Plaintiff back to life. She responded that she was doing her job. To which Larimer responded "If he was dead, you should have left the son-of-a-bitch dead." At this point the nurse informed him, in a state of aggitation, that such was not her job, and she made it quite clear she was hired to save lives and practice her profession, and she wasn't going to allow anyone to die if she could help it.

5.

They were still arguing about what she did, and his view of her job responsibilities when Plaintiff was taken out on the ambulance. When he returned from the local hospital, the nurse was no longer employed at DCF.

This nurse can provide testimony to what everone in medical could not help but overhear of the conflict between the two; be they current, contracted, or past employees of DCF Health Services; as well as the fact the nurse was fired by LArimer for saving Plaintiff's life, and her objection to Larimer's attitude about the fact.

This incident has also been a factor in the medical staff's attitude and reactions to Plaintiff's medical requests, needs, and treatments.

11.) The Defendants have offered a blanket denial of multiple facts. Yet, Plaintiff's medical file will support his claims by the fact all of the changes that have been made by unqualified staff, or at the directive of higher ups in the administrative process. Of course Plaintiff realizes these inter agency directives would not necessarily be included in his medical file (something the Defendants attorney is no doubt well aware of too), and this Plaintiff has no idea as to how to go about obtaining this information. However, he does know what he was told by individuals changing his medication, and is certain under oath they will attest to why they altered medications, refused medications, or were directed not to administer certain medications at specific times when it is clear in the medical history that the changes were made and Plaintiff's subsequent attempts to have his increased seizure activity treated were ignored for extended periods of time. Or, why his physical reactions to specific medications had him punished with removal of all medications, and his complaints not addressed by qualified "provider" for extended periods of time. Subjecting him to a variety of problems amounting to torture (medical indifference).

12.) Plaintiff also believes (in fact knows) there is video footage of the abuse he was subjected to when he was allowed to endure over 100 documented Grand

Mal seizures without proper treatment inside a medical holding cell. Which he was ordered into by the Health Service Administrator, Ray Larimer, to induce and observe seizures. He was taken off his medication, and refused administration of medication by Ray Larimer after numerous seizures were noted, and treatment requested by nursing staff. Sowewimo; and, Sealock v. Colorodo, 218 F.3d 1205 (10thCir.2000).

The facility Doctor was called as was Larimer. The Doctor ordered medication be administered, but LArimer as administrator, overrode the Doctor's orders and refused medication. If this is not in the medical history it proves the record keeping to be inadequate, and it can be testified to by the medical staff involved, present and former employees.

13.) It was during this event that the top facility administrators were made aware of the situation, observed Plaintiff, and did nothing to intervene. This is also an instance and matter of video recorded documentation. Video Plaintiff was told had been provided to ODOC as part of an active investigation due to the grievance filed on medical of this facility.

It should be noted by the Court that the grievance filed by Plaintiff after this event is not in the submitted Special Report. There is no report on this significant event to Plaintiff's complaint of medical mistreatment spearheaded and directed by DCF Health Service Administrator, Ray Larimer.

14.) Defendants claim this never happened. Yet, there is video of numerous people entering the isolation cell to include Warden Wilkerson (former warden of DCF); Asst. Warden Bonner; Chief of Security, Gentry (now Assist. Warden at DCF); Cief of Unit Management, MAdrid; Case MAnager, Morgan; CApt. Martinez; Srgt. Costello; and all the nursing staff on shift during that period, including Nurse Castro; Dr. Sanders, and Ray Larimer, C.O. Laurent, and C.O. First. All observed by Plaintiff watching him at some point when he would come out of a seizure event.

Some of these people talk with Plaintiff today about what they saw take place during that particular period. Many of whom, prior to this, believed Mr. Larimer's openly contemptuous attitude and claims of Plaintiff's seizures being faked. Several have apologized for their behavior prior to their witness of the event in medical holding cell, that preceded his being locked in Segregated Housing.

15.) In Segregation Plaintiff was placed on a top bunk, though medically restricted to a bottom bunk for a number of years prior. Ray Larimer overrode the restriction and authorized Plaintiff to be placed on a top bunk for the sole pupose of moving him out of the medical observation cell.

16.) Plaintiff filed multiple complaints and requests to medical about his seizures, including the fact that he had fallen off his bunk injuring his neck and sholder.

All these complaints, and requests for medical attention should be a part of his medical file, and should have been made a part of the Spaecial Report, along with the medical response to each. Every doctor report should also be a part of the report, including Plaintiff's Psychological Evaluations and treatment during this period.

17.) Plaintiff noticed he has no psychological evaluations in this report at all. In his previous suit the Defendant's attorney (the same attorney in the present case) included the evaluations.

Plaintiff speculates this is due to fact he did ask for help from Psych. Services following his treatment in medical cell, during the subsequent months of confinement in Seg. Housing. The Psych. evaluation/report may prove relevant to assessing his state of mind prior to the mistreatment he managed to live through, and as result of same. Having any evaluation prior to his arrival at this facility to compare with all subsequent evaluations will also be relevant in that such will demonstrate, if nothing else, the degree of emotional and

mental duress he has been subjected to through these irresponsible and unprofessional actors, who have exercised unchecked control of his neurological condition and the treatment thereof from the point of his arrival at the Davis Correctional Facility.

18.) The submitted Report is insufficiant to meet the points raised in the action filed, or to support the denial fainted to by the Defendants.

19.) Plaintiff submitted a complaint regarding the lack of adequate, and proper treatment of his well documented and well known seizures by DCF medical staff from the point of his arrival. Every document regarding and related to his seizures prior to his arrival; maintained in ODOC medical files; and every report related to his seizures; including any that may be on file with security staff of the facility; and every report related to his seizures, medication adjustments, authorization for such, and directives related to such, etc. should have been included in the inadequately formulated Report submitted to this Court.

20.) In Richardson v. McKnight, 117 S.Ct. 2100, 521 U.S. 399 (U.S.Tenn. 1997) the Supreme Court held, "prison guards who are employees of a private prison management firm are not entitled to qualified immunity from suit by prisoners charging a violation of § 1983." and "Mere performance of a governmental function does not support immunity for a private person, especially one who performs a job without government supervision or direction."

21.) Plaintiff has sustained life long damage to his physical body, internal organ, and neurological system, as result of Defendants neglegence, and general medical indifference. His health and safety have been placed in jeopardy on several occasions and in a continuous manner over the years he has been under the exclusive care of DCF Health Services and its administrators. He has endured damage to his spine, back, eyesight, the flesh of his face and body, heart, brain, nervous system and likely other internal organs, irreparable damage, that has affected his present quality of life, as well as his future quality

of life, and longevity. His basic health - present and future.

His safety has been put in jeopardy by fact he has been subjected to treatment by persons who have blatantly ignored qualified evaluators of his health issues and adopted their own treatment based on misconceived ideal that was and is not any part of his diagnoses prior to his arrival at DCF by medical specialists who determined with extensive testing exactly what his problem is and how best to treat the problem in an effort to insure the best possible quality of life and longevity medical science was capable of providing.

The unqualified medical personnel, whose motivation is without moral, or legal justification, have done all but execute Plaintiff in their lack of concern for his health and safety.

22.) The Oklahoma Government Tort Claim Act (OGTCA) does not apply to federal causes of action and, in particular, that it cannot immunize defendants from § 1983 liability. See, e.g., Tiemann v. Tul-Center, Inc., 18 F.3d 851, 853 (10th Cir. 1994)(holding § 1983 claim cognizable even though a state-law remedy was foreclosed under the OGTCA).

23.) The Defendants attempt to limit Plaintiff's claim with the watered down submission, distracting from the situation and claim presented by Plaintiff. He has followed and completed the Grievance process directed by the ODOC for exhaustion of his complaint regarding this issue with the Davis Correctional Facility Health Department's failure to follow the Medical Specialist's orders, directives, and recommendations for evaluation and treatment of his medical condition. The latest assualt on his health and safety that he has been subjected to and endured since his arrival at the facility.

The fact that this instance is the latest does not discount or override fact that all those instances prior to and leading up to this filing, including his latest grievance on this matter, are not relevant to the whole, or complete abuse of his health instigated by the proprietors of this facility from the

time the medical department began to change his treatment.

24.) Not only did the Defendants not provide adequate information to address the complaint made from point of Plaintiff's arrival at DCF, but also failed to adequately provide information that should have been in his medical file after Dr. El Zind was brought into the picture.

First of all, Plaintiff did not find record/order/or request by Dr. Sanders D.O., General Practicioner, for evaluation of Plaintiff's condition by a Neurologist. He questions what happened to the initial evaluations that were in, and should have been a part of Plaintiff's medical file and the 'Special Report'.

25.) Where is the medical record reflecting the decision to put Plaintiff in a medical observation cell and subject him to 127 Grand Mal seizures and deny him medication. A situation that preceded, and was a catalyst for the cause at hand.

26.) Dr. El Zind directed, "To further evaluate his condition, I am in need of his most recent radiology (MRI, CT, or X-Ray) and lab work." The most recent of these was when Plaintiff was in ODOC prison, before his arrival at DCF.

27.) The provided record of RTS submissions by Plaintiff supports fact that every time he was taken to see Dr. El Zind she inquired how he was doing with the medication she prescribed only to be made aware it had not been provided. This happened several times until she informed Plaintiff she was tired of DCF medical Dept. not providing the medication she prescribed, and intended to contact ODOC directly to correct the matter of her orders, as his attending physician, being ignored. Still, DCF ignored ODOC as well as Dr. El Zind, continuing to NOT provide the medication as ordered.

On 5/30/16, Plaintiff saw Dr. El Zind for the last time. With him in the room, she contacted the Medical Director of ODOC, and again made it clear her orders were being denied by DCF medical department and since ODOC ordered him

11.

brought to her to be evaluated she, as his attending physician, wanted him put at a facility that would follow her medical directives or she wanted DCF to obey her orders immediately. She was tired of wasting her time trying to deal with DCF medical.

None of this is in the Special Report though it should be part of the record maintained by DCF and ODOC. It most certainly is part of Plaintiff's medical file and history with Dr. El Zind at General Neurology, EEG-EMG.

28.) Plaintiff submitted a claim wherein he has been denied his rights as protected under the 8th Amendment. Not a State law violation, but a Constitutional violation of his right to be protected against abuses of authority under contract and with exclusive control of his medical issues as the Health Service Department of the Davis Correctional Facility has been for over a decade. Had it not been for Dr. El Zind's instruction, the medical service of DCF would have continued to deny proper medication and continued to exact its abuses upon Plaintiff both physically and mentally, as it has since his arrival at the facility and the directives of the Neurologist prior to his arrival being ignored, denied, and abrogated for reason unjustified, or justifiable.

29.) Plaintiff would ask the Court to direct the Defendants to produce the complete medical file of Christopher Olen Baker with all documents related to his seizures, prior to, and during his stay at DCF. To include any directives, or communications, from or with the Chief Medical Officer over CCA?CC effecting or connected to changes in Plaintiff's medications, at any point over the years, since submission by the State of his person to the medical dept. of the Davis Corr. Facility. To include any psycological assessments prior to his arrival, during his ordeals with medical, and current, at the Davis Facility.

30.) Further, after submission of the complete, and comprehensive requested information, properly addressing the initial Order of the Court, by the Defendants, in a timely manner, this Honorable Court hold this case ripe for

trial.

Wherefore, for the above stated reasoning, Plaintiff Moves the Court Order the Defendants provide the complete medical history of Plaintiff's seizure activity included in his medical file, and all other documentation related to or concerning his medication administration over said years, as well as his Psychological assessments over the period for a complete and comprehensive report to be had and provided this Court.

Respectfully Submitted,

*[signature: Christopher O. Baker]*

Christopher O. Baker, 149839
Davis Correctional Facility
6888 E. 133rd Rd.
Holdenville, Ok. 74848

### Certificate Of Service

I, Christopher O. Baker, do hereby certify that on the 11 day of June 2018, I served the attached Objection To Defendants Special Report Submission by placing same in the Davis Correctional Facility Legal Mail Service addressed to the following:

Darrell L. Moore
P.O. Box 368
Pryor, Ok. 74362

*[signature: Christopher O. Baker]*

Christopher O. Baker