# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

CHRISTOPHER OLEN BAKER, )
)
            Plaintiff, )
)
v. ) No. CIV 17-368-JHP-SPS
)
JAMES YATES, et al., )
)
           Defendants. )

## OPINION AND ORDER

Plaintiff is a pro se prisoner in the custody of the Oklahoma Department of Corrections (DOC) who is incarcerated at Lawton Correctional Facility in Lawton, Oklahoma. He brings this action under the authority of 42 U.S.C. § 1983, seeking relief for alleged constitutional violations during his incarceration at Davis Correctional Facility (DCF), a private prison in Holdenville, Oklahoma. The defendants are James Yates, DCF Warden; Ray Larimer, DCF Health Service Administrator; and Dr. Sanders, DCF Physician. The Court has before it for consideration Plaintiff's complaint (Dkt. 1), a special report prepared by DCF officials at the direction of the Court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (Dkt. 17), Defendants' motion for summary judgment (Dkt. 43), and Plaintiff's response to the motion (Dkt. 47).

Plaintiff alleges his life has been placed in jeopardy "by the unconscionable /unjustifiable maleficent treatment; refusal to acknowledge documented medical issues; refusal to seek specialized [treatment] or follow recommended treatment ordered by a specialist when obtained." (Dkt. 1 at 2). He claims that since his arrival at DCF, he has been subjected to long-term damage to his heart, brain function, and nervous system. In addition, he allegedly has been disfigured by scarring, and his nose has been broken, impairing his ability to breathe, rest, and smell. He also asserts his spine was subjected to increased

damage because of uncontrolled falls associated with seizures. In addition, he allegedly has been subjected to years of emotional distress in his efforts to receive proper evaluations and treatment. Finally, he claims he has endured abuses from medical administrators, facility physicians, nurses, and security staff as the result of the deliberate indifference perpetrated upon him.

Plaintiff alleges he arrived at DCF in July 2005. Prior to his incarceration at DCF, he had extensive evaluation, screening, and testing by a neurologist to determine the source of his severe neurological seizures and to determine how to best manage his seizures and the migraine headaches associated with them without causing an allergic reaction. He claims he was supposed to be monitored by a neurologist on a regular basis, with adjustments in his medication as needed. He complains that since arriving at DCF, his medication has been changed to his detriment and without consultation with a specialist, resulting in increased and more intense seizures.

**Standard of Review**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A party opposing a motion for summary judgment, however, may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c).

Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Statute of Limitations**

Plaintiff's lengthy complaint consists of pages of mostly undated allegations concerning Defendants' alleged deliberate indifference to his serious medical needs. The statute of limitations for a civil rights cause of action in Oklahoma is two years. *Meade v. Grubbs*, 841 F.2d 1512, 1522 (10th Cir. 1988). Defendants have moved for summary judgment on any claims arising more than two years prior to the filing of this complaint.

Plaintiff has not addressed this issue, with the exception of stating in his response to the motion that the two-year limitation "allows only a limited look at the problems endured and suffered through by Plaintiff at the hands of his providers." (Dkt. 47 at 10-11). He has provided no additional dates to clarify his allegations.

Here, the Court finds there is no genuine dispute as to the fact that all claims occurring more than two years prior to filing the complaining are barred, or that Defendants are entitled to a judgment as a matter of law on this issue. Therefore, summary judgment is granted on the issue of the statute of limitations. Under the prisoner "mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270, 276 (1988), the complaint is considered to have been filed on September 29, 2017. (Dkt. 1 at 17). Therefore, all claims arising before September 29, 2015, are time barred and will not be considered.

**Exhaustion of Administrative Remedies**

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs. Defendants assert Plaintiff failed to exhaust the administrative remedies for any of his claims. "No action shall be brought with respect to prison conditions under section 1983 of

this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed. *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001).

"An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). In deciding a motion to dismiss based on nonexhaustion, the Court can consider the administrative materials submitted by the parties. *See Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003), *abrogated in part on other grounds*, *Jones v. Bock*, 549 U.S. 199 (2007).

According to the DOC Offender Grievance Process, OP-090124, an inmate first must attempt to resolve his complaint informally by communicating with staff within three days of the incident. If that is unsuccessful, he may submit a Request to Staff (RTS) within seven calendar days of the incident, alleging only one issue per form. If the offender does not receive a response to his RTS within 30 calendar days of submission, he may submit a grievance to the Review Authority (warden's office), asserting only the issue of the lack of response to the RTS. If the complaint is not resolved after the response to the RTS, the offender then may file a grievance. If the grievance also does not resolve the issue, the inmate may appeal to the Administrative Review Authority (ARA) or the Medical Administrative Review Authority. The administrative process is exhausted only after all of these steps have been taken. (Dkt. 43-3).

The record shows Plaintiff filed three grievances during the two years prior to his

filing this complaint. The use of the administrative remedies process, however, did not exhaust his claim of deliberate indifference to his serious medical needs.

(1) Grievance No. 2015-1001-346-G (Dkts. 17-3 at 2-6; 43-4 at 2-6): On October 5, 2015, Plaintiff submitted an RTS to Defendant Health Services Administrator Larimer, stating that on September 22, 2015, Nurse Practitioner Burkhalter ordered that Plaintiff see Dr. Sanders because of his seizures, his head, neck and shoulder injuries, and pain in all areas resulting from three falls from the top bunk in August 2015. Plaintiff asked why he had not been seen by Dr. Sanders and when would he see Dr. Sanders. Larimer's response stated Plaintiff was seen by Nurse Practitioner Castro who discussed Plaintiff's medical record with Dr. Sanders. Therefore, Plaintiff did not need to see Dr. Sanders.

On October 15, 2015, Plaintiff submitted Grievance No. 2015-1001-346-G, requesting to see Dr. Sanders for treatment of his pain and suffering. The grievance was returned to Plaintiff unanswered, because the RTS and grievance were not timely filed.

Plaintiff's claim in his complaint that Defendants were deliberately indifferent to a serious medical need was not exhausted by this grievance. He makes no assertion medical staff was inattentive or were ignoring him. To the contrary, Plaintiff acknowledged he was seen by medical personnel, *i.e.*, Nurse Practitioners Burkhalter and Castro.

(2) Grievance No. 2015-1001-383-G: (Dkts. 17-3 at 9-12; 43-4 at 9-12): On November 6, 2015, Plaintiff submitted an RTS to Defendant Larimer, indicating he needed to see Dr. Sanders to have his seizure medication (Neurontin/gabapentin) renewed, because his prescription ran out on November 2, 2015. Larimer responded on November 9, 2015, stating that Dr. Sanders had renewed Plaintiff's medications.

Although he was notified that the medication had been renewed by Dr. Sanders, Plaintiff submitted Grievance No. 2015-1001-383-G on November 16, 2015, requesting to

5

see Dr. Sanders to get his medications renewed. Plaintiff's request was granted, noting that Dr. Sanders had reviewed the request and had renewed Plaintiff's seizure medication.

Plaintiff's claim in his complaint that Defendants had been deliberately indifferent to a serious medical need was not exhausted with this grievance submission, because Plaintiff did not appeal to the ARA or the Medical ARA.

(3) <u>Grievance No. 2016-1001-184-G</u> (Dkts. 17-3 at 15-22; 43-4 at 15-22): On June 15, 2016, Plaintiff submitted an RTS to "Davis Medical" and Dr. Sanders, stating the medication adjustments that were ordered by a specialist had not been followed. He requested that the changes ordered by the specialist be implemented.

Jamie Lysinger, R.N., responded to the RTS on June 17, 2016. Nurse Lysinger stated that Dr. Sanders had reviewed Plaintiff's chart and spoken with the neurologist (Dr. El Zind). At that time Plaintiff was on the medication regimen that Dr. Sanders felt was best, and Dr. Sanders previously had discussed this with Plaintiff.

On June 24, 2016, Plaintiff submitted Grievance No. 2016-1001-184-G to Warden Tim Wilkinson, requesting immediate implementation of Dr. El Zind's orders. Plaintiff stated, "Immediately implement the prescription order's [sic] of Dr. El Zind, and I will waive the formal apology from H.S.A. Administrative staff. Defendant Larimer responded on June 30, 2016 as follows:

> I/M Baker wanted to receive the medication ordered by the specialist.
>
> After an investigation of the matter by Jamie Lysinger, Clinical Supervisor, it was determined that I/M Baker's chart was reviewed by Dr. Sanders here at DCF. Dr. Sanders spoke with the neurologist and I/M Baker is currently on the medication regiment [sic] that Dr. Sanders feels is best and it has been discussed previously with I/M Baker.
>
> I/M Baker's RELIEF is DENIED.

(Dkts. 17-3 at 19; 43-4 at 19).

6

Plaintiff appealed to the DOC Chief Medical Officer, complaining that he was not given the specific date when Dr. Sanders spoke with the neurologist, and he wanted to know why Dr. Sanders continued to ignore the neurologist's orders. The appeal was denied as follows:

> Pertinent information from your electronic health record (EHR) was reviewed. According to your record, a medical provider met with you on July 19, 2016, and your medication regimen was discussed. However, the medical provider did not adjust your Neurontin dosage.
>
> According to OP-140121, the health care provider who initiates the outside medical referral request must approve the consultant's recommendations, prior to implementing them. The medical provider may or may not elect to adhere to the consultant's recommendations.
>
> If you need further assistance with any health concerns, you must submit a "Request for Health Services" form (attached) to the medical unit at your facility, via the sick call process.

(Dkts. 17-3 at 15; 43-4 at 15).

After careful review, the Court finds there are no genuine issues of material fact concerning Plaintiff's failure to exhaust the administrative remedies for his claim of deliberate indifference to his serious medical needs, as presented in the complaint. Therefore, Defendants motion for summary judgment with respect to exhaustion of administrative remedies must be granted.

**Deliberate Indifference**

Defendants also have moved for summary judgment with respect to Plaintiff's claim of deliberate indifference to his serious medical needs. Under the Eighth Amendment, prisoners have a constitutional right to medical care, which is violated when doctors or prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Deliberate indifference "involves both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002)

(citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837). However, the "'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

The special report shows that in October 2015 Plaintiff submitted several Requests for Health Services, and responses were issued in a timely manner. In addition, Plaintiff was seen by medical staff on at least three occasions, including an appointment on October 5, 2015, when he was seen by the facility Nurse Practitioner, Denise Castro, MSN, ARNP, ANP-BC, for complaints of neck and left clavicle pain, along with a bump on his head. Nurse Castro charted that Plaintiff was "jovial and cooperative today." (Dkt. 17-1 at 3-7)).

On November 2, 2015, Plaintiff submitted an RTS indicating several of his prescribed medications needed to be renewed. He submitted another request two days later, on November 4, 2015, specifically requesting renewal of gabapentin. *Id*. at 17-18. That same date, Dr. Sanders renewed Plaintiff's medications and charted the following note to him:

> Sdir [sic]: First I want to thank you with being compliant with taking your medications. Your most recent lab showed your gabapentin level to be too high and at risk of possible side effects. The Regional Medical Director has requested that we lower the dose from 3600 mg to 2400 mg which may help with your mentation and stability. I got him to approve scheduling you with a neurologist for evaluation, poss. brain wave test, and evaluation to determine

8

> what might be the best treatment for you. Obviously, since you are still reporting having seizures, what we are doing doesn't seem to be working. At this point I do not know how long it will take to get an appointment, but we will try to get it as soon as possible. Thanks again.

*Id.* at 20.

Plaintiff later told Dr. Sanders that he had not received this note. When Plaintiff was seen on November 18, 2015 by Dr. Sanders, the doctor discussed medication dosing and reasons for a change in dosage. The physician had noted Plaintiff's blood tests had shown the levels of Neurontin were too high. (Dkt. 43-5, Affidavit of Dr. Sanders, ¶¶ 8-10). According to Dr. Sanders, Plaintiff became upset, he began yelling and cursing, and the medical visit was terminated. (Dkt. 17-1, Plaintiff's medical records, at 30-35). Dr. Sanders charted that he did raise the prescribed dosage of Neurontin. (Dkt. 17-5 at ¶ 10). Dr. Sanders and the medical staff at the facility arranged for an outside consultation for Plaintiff with a neurologist, Nabila H. El Zind, M.D., a board-certified neurologist. Dr. El Zind asked that a CT scan of Plaintiff's head be obtained, and she also wanted to conduct EEG testing. (Dkt. 17-5 at ¶ 12). Plaintiff was transported from the prison facility to meet with Dr. El Zind on March 22, 2016; May 30, 2016; and December 5, 2016. *Id*. at ¶¶ 12, 15, 18). Plaintiff also was transported from the prison facility to Holdenville General Hospital on April 15, 2016, for a CT scan of his head. *Id*. at ¶ 13. On April 28, 2016, Dr. El Zind performed an electroencephalogram. *Id*. at ¶ 13. No acute findings were reported from the CT scan, and Dr. El Zind reported the EEG was normal. *Id*. at ¶ 13.

Dr. El Zind recommended to Dr. Sanders that the prescribed daily dosage of gabapentin (Neurontin) be increased to 3,600 mg. daily. Because Plaintiff's blood level of Neurontin was measured to be well outside the therapeutic range when the dosage previously was 3,600 mg, per day, however, Dr. Sanders, as treating physician, determined it would not be in Plaintiff's best interest to increase the dosage at that time. *Id*. at ¶ 12.

9

On May 12, 2016, Dr. Sanders and Dr. El Zind spoke at some length regarding Plaintiff and his medical condition. They agreed that based the results of Plaintiff's lab testing and CT scan, the medication dosages were sufficient and correct for his reported seizure activity at that time. *Id.* at ¶ 14.

Dr. Sanders made the following assessment of Plaintiff in his affidavit:

> Neurontin slows down nerve impulse transmission to the brain, making it an appropriate anti-seizure medication for epileptic seizures. Generally, it is not used to treat non-epileptic pseudo seizures. However, because of its sedative effect, it also can be helpful when treating mental health issues and it also acts somewhat as a pain reliever. According to Dr. Sanders, Plaintiff presented periodically with mental health issues, and he was seen by the facility psychiatrist. Plaintiff also periodically made generalized complaints of pain he related to pre-incarceration motor vehicle accidents, falls in his cell, and interactions with other inmates.

*Id*. at ¶ 17). As the treating physician, Dr. Sanders added or deleted medications based on his determination of medical necessity. *Id*. at ¶¶ 15, 16, 18.

After careful review, the Court finds Plaintiff's medical records and Dr. Sanders' affidavit demonstrate that Dr. Sanders and the medical staff kept an appropriately close watch on Plaintiff and his medical condition. Plaintiff received medical testing, prescription medications, and an outside specialist consultation. The diagnostic testing revealed no acute findings and normal test results. Dr. Sanders conferred with the outside consultant and adjusted Plaintiff's prescribed medications as was medically appropriate and necessary.

The Court further finds the acts complained of do not show deliberate indifference to Plaintiff's medical needs as alleged. It is clear from the record that medical care was provided. Where there is such evidence of a "series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a 'deliberate indifference' to the prisoner's complaints." *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976). To the extent Plaintiff is complaining about the inadequacy of medical care provided, the Court finds he is merely

asserting a difference of opinion as to the kind and quality of medical treatment necessary under the circumstances. It is well settled that this type of disagreement fails to give rise to a cause of action under § 1983. *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977), *cert. denied*, 435 U.S. 917 (1978), and cases cited therein.

To the extent Plaintiff is complaining of a delay in his treatment, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). There were, however, no instances of delay that amounted to deliberate indifference.

After careful review, the Court finds there are no genuine issues of material fact concerning Defendants' allegation that they were not deliberately indifferent to Plaintiff's serious medical needs. Therefore, summary judgment must be granted.

**ACCORDINGLY,** Defendants' motion for summary judgment (Dkt. 43) is GRANTED, and this action is DISMISSED in its entirety.

**IT IS SO ORDERED** this 8th day of October 2019.

James H. Payne
United States District Judge
Eastern District of Oklahoma